[Civ. No. 10320.    Third Dist.    Mar. 20, 1962.]

KEITH REID et al., Plaintiffs and Appellants, v. LOUIS G. DUNN et al., Defendants and Respondents.

Keith Reid and Helen S. Reid, in pro. per., for Plaintiffs and Appellants.

Huberty & Huberty and George A. Huberty for Defendants and Respondents.

PIERCE, J.—This is an appeal from a judgment in favor of defendants establishing the common boundary of the lands of plaintiffs and defendants along a line surveyed by Paul B. Russell, County Surveyor of Calaveras County, as shown upon a record of survey map dated September, 1959.

All of the lands are located in Township 5 North, Range 14 East, Mt. Diablo Meridian. Plaintiffs own all of section 8 thereof and all of the west half of section 9 excepting 40 acres. Defendants own all of sections 16 and 17. The boundary in dispute is the east-west line common to sections 8 and 17 and the east-west line common to the west halves of sections 9 and 16.

These common section lines were fixed by an official United States Survey in 1873, from which both parties derive title. Mr. Russell, employed by defendants to survey this line (and to fix the other boundaries of their lands) found that the section corners common to sections 7, 8, 17 and 18 and to sections 8, 9, 16 and 17 were "lost corners" as defined by section 360 of the Manual of Survey Instructions 1947, United States Department of the Interior, Bureau of Land Management, and reestablished said corners by the "double proportionate measurement method" as set forth in said manual, section 367 et seq. His survey was commenced in 1958, completed in 1959.

It is not questioned that if said corners were actually "lost" Mr. Russell properly applied the "double proportionate measurement method" to reestablish them. The contention is that the corners were not "lost," that they were

possibly "existent corners"[1] or at the most "obliterated corners"[2] which could have been reestablished by means other than by use of proportionate measurement, and, therefore, application of the latter method was improper.

The court found that the corners in question were "lost corners" and our examination of the record convinces us that the court was justified in this determination.

"A lost corner is a point of a survey whose position can not be determined, beyond reasonable doubt, either from traces of the original marks or from acceptable evidence or testimony that bears upon the original position, and whose location can be restored only by reference to one or more interdependent corners." (Manual of Surveying Instructions 1947, § 360. See also *Chandler* v. *Hibberd,* 165 Cal.App.2d 39, 52 [332 P.2d 133].)

"If there is some acceptable evidence of the original location that position will be employed in preference to the rule that would be applied to a lost corner." (Manual of Surveying Instructions, § 360.)

"The engineer is not prepared to consider the restoration of a lost corner until he has exhausted every other means of identifying its original position, and at this stage of his work he should have determined upon an approximate position of the original monument based upon his findings resulting from retracements leading from known corners to the lost corner, from one, two, three or four directions in accordance with the plan of the original survey." (*Idem.* § 361.)

The contention that the corners in question were "existent" may be disposed of without difficulty. Of the two corners, that common to sections 7, 8, 17 and 18 had for its monument, according to the field notes of the 1873 survey in evidence, a black oak, with no indicated accessories. The section corner common to sections 8, 9, 16 and 17 had a black oak

---

[1] "An existent corner is one whose position can be identified by verifying the evidence of the monument, or its accessories, by reference to the description that is contained in the field notes, or where the point can be located by an acceptable supplemental survey record, some physical evidence, or testimony." (Manual of Surveying Instructions 1947, § 350.)

[2] "An obliterated corner is one at whose point there are no remaining traces of the monument, or its accessories, but whose location has been perpetuated, or the point for which may be recovered beyond reasonable doubt, by the acts and testimony of the interested landowners, competent surveyors, or other qualified local authorities, or witnesses, or by some acceptable record evidence." (*Idem,* § 355. See also *Chandler* v. *Hibberd,* 165 Cal.App.2d 39, 52 [332 P.2d 133].)

post 4 by 4 inches in diameter, as a monument with a charcoal mound as accessories. None of these were ever found by Mr. Russell, or by the United States Government surveyors who made a resurvey in 1937, or by County Surveyor Coulter who made a 1924 survey or by the Pacific Gas and Electric surveyor who surveyed a right of way line in the area in 1959, or by any of the present or former owners of land in the area. Plaintiff Keith Reid, who is himself a civil engineer, and who testified at the trial, made no mention that he had found any traces of the monuments of the corners or accessories. The area is rugged terrain and very brushy but this would not have prevented discovery of the monument, a black oak tree 12 inches in diameter in 1873. As for the accessories, it is apparently the position of plaintiffs that it was the obligation of the surveyor to undertake a clearing project of an area (in the case of each corner) which might encompass a radius of more than 500 feet on the remote chance that traces of charcoal would be discovered. We cannot agree.

We conclude, therefore, that the evidence clearly established that the corners were not "existent." They were either "obliterated" or "lost."

Appellants cite *Cragin* v. *Powell*, 128 U.S. 691 [9 S.Ct. 203, 32 L.Ed. 566]; *County of Yolo* v. *Nolan*, 144 Cal. 445 [77 P. 1006]; *Weaver* v. *Howatt*, 161 Cal. 77 [118 P. 519]; *Weaver* v. *Howatt*, 171 Cal. 302 [152 P. 925]; *Chandler* v. *Hibberd, supra*; *Verdi Dev. Co.* v. *Dono-Han Mining Co.*, 141 Cal.App.2d 149 [296 P.2d 429]. These cases express, with varying phrases, the rules that an action to quiet title and establish a boundary line where title and the line are based upon a government survey is not an action to vacate the survey. The surveys govern even when they are erroneous and control the location of boundaries and corners. It is said: " 'A survey of public lands does not *ascertain* boundaries; it *creates* them.' " (*Verdi Dev. Co.* v. *Dono-Han Mining Co., supra*, at page 152, quoting from *Robinson* v. *Forrest*, 29 Cal. 317, 325.) If monuments are obliterated and undiscoverable, corners should be reestablished wherever possible in accordance with natural objects described in the field notes of the original survey. And the proportional method must not be resorted to unless the line cannot be retraced and its corners relocated by reference to natural objects of the field notes and all other prescribed methods fail.

In a pamphlet "Restoration of Lost or Obliterated Corners and Subdivision of Sections," United States Dept. of the In-

terior, Bureau of Land Management, 1952, it is stated on page 29 that retracement of the lines of public land surveys should include the following steps:

"a. Secure a copy of the original plat and field notes;

"b. Secure all available data regarding subsequent surveys;

"c. Secure the names and contact the owners of the property adjacent to the lines that are involved in the retracement;

"d. Find the corners that may be required:

First: By the remaining physical evidence;

Second: By collateral evidence, supplemental survey records, or testimony, if the original monument is regarded as obliterated, but not lost, or;

Third: By application of the rules for proportionate measurement, if lost;

"e. Reconstruct the monuments as required, . . . ." etc.

There is evidence, and the trial court inferentially found, that County Surveyor Russell complied with each of these steps. He was thoroughly familiar with the original plat and field notes (they are in evidence as plaintiffs' exhibits 4 and 5) and with the resurvey of lands to the north made by the United States in 1937. He also secured, and was familiar with, the survey of Mr. Coulter. He had talked with the original owners of the ranches all around the area. (Several of the present owners, Bosse, Dunn, Mr. and Mrs. Remington, Scott, and Miller, son-in-law of the Remingtons, testified. No one threw any light on the location of either of the corners on the ground.) He had talked with the timber cruisers from the three logging outfits who had cut the timber in the area. Mr. Russell went to the title company and searched the records of the county. He found the known corners, to-wit: The corner common to sections 19, 20, 29 and 30 (this had been reestablished by the U.S. Survey of 1937) ; the corner common to sections 12, 7, 18 and 13 (there the 1873 survey monument had been found and the corner reestablished by the 1937 U.S. Survey) ; the corner common to sections 6, 5, 8 and 7 (which had been reestablished in the U.S. Survey of 1937 by the double proportionate method) ; the corner common to sections 5, 4, 9 and 8 (there also an 1873 survey monument had been found and the corner reestablished by the 1937 survey) ; the corner common to sections 9, 10, 15 and 16 (marked by a black oak tree as described in the field notes of the 1873 survey).

Besides the lost corners in question, no trace could be found

of the corner common to sections 18, 17, 20 and 19 or the corner common to sections 8, 9, 16 and 17; nor could any of the quarter section corners be found.

Next, Mr. Russell tried to set the corners by referring to the objects mentioned in the field notes. He could not do so by the calls. Checking out the distances stated in the field notes he found discrepancies of from 300 to 700 feet; e.g., measuring from Esperanza Creek (running easterly and westerly) on the common boundary between sections 7 and 8 to the "summit of dividing ridge" on the common boundary between sections 17 and 18 the discrepancy was from 500 to 700 feet. It seems significant that not one of the now existent objects mentioned in the field notes is located *only* on the lines of the survey. All are objects crossing the assumed line, such as ditches, summits of ridges, creeks, gulch bottom, hill bases.

Appellant cites *Weaver* v. *Howatt*, 161 Cal. 77 [118 P. 519], in support of the rule that even where the distances from natural objects given in the field notes of a survey are inaccurate, the double proportionate measurement method is not properly resorted to, if the approximate position of the corner can be located by reference to these objects and from other data appearing in the field notes. There the total length of the line in question was 9.49 chains short. As to one of the objects the distance on the ground differed from that recorded in the notes by as much as 27.58 chains.[3] But in another instance the difference was as little as 1.10 chains; in another 2.33 chains, all this over hilly and rough ground. There the notes had described a terrain at the corner which was totally different from that where the corner was as located by double proportion. It was held that the corner as fixed by the court must give way, as evidence of location, to the natural objects mentioned in the field notes.

There is no comparable evidence in this case of any difference in terrain between the corners as set by Mr. Russell and the corners described in the field notes. There the corner could be fixed at an approximate location as shown on the map by reference to natural objects shown in the field notes. Here, Mr. Russell testified it would have been impossible to fix the corners by reference to the natural objects mentioned in the notes. He said: "You have at least 500 feet difference between the ridges. If you set from one ridge [there] would be 500 feet difference from if you set it from the other ridge.

---

[3] 1 chain = 66 feet.

That is two different corners you would have if you set it by calls which would be 500 feet apart." The facts here, therefore, are distinguishable from those in *Weaver* v. *Howatt*, 161 Cal., *supra*. In that case it is to be noted the court said, on page 80:

"The propriety of this mode [i.e., the double proportionate measurement method] of adjusting boundary lines of United States sections and sectional subdivisions, in a case where the places where the original monuments were set cannot be located on the ground, and the objects referred to in the record of the official survey furnish no means of finding the actual location of the original lines or corners, is not seriously disputed."

In that case there were data in the notes and maps from which the approximate actual location of the corner and line in controversy could have been determined. Appellants contend the same is true here. There was substantial expert testimony here to the contrary. The trial court accepted it. It was a question of fact, resolved by the court in defendant's favor. (*Luginbuhl* v. *Hammond*, 179 Cal.App.2d 350, 355 [3 Cal.Rptr. 582].)

Appellants' reasoning, in part, seems to be that since the corner at the range line, i.e., the corner common to sections 12, 7, 18 and 13 was known, the corners common to sections 7, 8, 17 and 18 and to sections 8, 9, 16 and 17 should have been fixed by running a traverse due east (or at 89 degrees 53 minutes east), setting the first corner at 79.27 chains and the second at 80.04 chains, according to the calls of the 1873 survey. This was what the Coulter survey had done in 1924 (as to the east-west line common to sections 7 and 18).

Appellants refer to the Coulter survey as a survey of "long acquiescence . . . which located the original government corners." No evidence supports this contention. Mr. Coulter merely ran a line along the compass bearing from the corner common to sections 7 and 18 on the range line and for the distance set forth in the 1873 field notes. This line seems to have been run to enable Bosse to quiet the contentions of two sisters who then owned the property adjoining him on the south. The line thus surveyed was then fenced and agreed upon as the boundary. Coulter, in his notes, mentioned none of the objects stated in the field notes of the 1873 survey and there is no indication therein that he located the corner in question or made any effort to set one.

As the basis of reestablishing a lost corner there could be no justification to do so by running a single east-west line from one known corner, any more than by running a single line either east-west or north-south from any of the other known corners. And when such lines are run from all of the known corners, four different termini corners are obtained (which, in this case, seem to differ by as much as 800 or 900 feet). That is what necessitates use of the double proportionate measurement method when the corner cannot be determined by other acceptable evidence.

Appellant contends that defendant's surveyor adopted the proportional method for the purpose of equalizing the areas within section 8 (belonging to plaintiff) and section 17 (belonging to defendant) as nearly as could be done. No evidence in this record justifies such a charge. It happens, however, that by use of the double proportionate method the respective acreages are: In section 8, 601 acres; in section 17, 611 acres. There are 106 acres in the disputed area. Under the plat of the 1873 survey both sections are shown as standard (640 acres). As appellants would have it, section 8 would be substantially oversized.

The next contention made by appellants is that Mr. Russell also justified use of the method of double proportion because the surveyors in the United States Survey of 1937 had set the lost corner of sections 6, 5, 8 and 7 by that method. Mr. Russell did not so state. What he did say was that the government surveyors in 1937 could no more locate that corner from monuments or accessories on the ground or from discoverable natural objects (some of which were the same objects which Russell had for reference) or from other evidence, than could he. The government surveyors, therefore, following the rules of the Manual, had had to use the double proportionate method, just as he had done.

The other contentions raised by plaintiffs are repetitious and we find them to be without merit.

The Russell survey was made over a period of a year and a half. The evidence shows that Mr. Russell is a qualified surveyor of long experience. The Record of Survey Map in evidence (defendants' exhibit "A"), as well as Mr. Russell's testimony, shows careful preparation and execution of the survey in compliance with the rules established by the United States Bureau of Land Management and the Surveyor Gen-

eral of California, and the case law of this state. The evidence supports the findings and judgment of the trial court.

The judgment is affirmed.

Peek, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied April 16, 1962, and appellants' petition for a hearing by the Supreme Court was denied May 16, 1962.